UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

THEODORE LARNARD,

                         Plaintiff,                            **DECISION AND ORDER**

            v.                                     6:17-CV-06257 EAW

SECRETARY DENIS R. McDONOUGH,
DEPARTMENT OF VETERANS AFFAIRS,[1]

                         Defendant.

_____

## INTRODUCTION

Plaintiff Theodore Larnard ("Plaintiff") filed this action on April 25, 2017, against the Secretary of the Department of Veterans Affairs ("Defendant") alleging that management at the Canandaigua Veterans Affairs Medical Center ("CVAMC") discriminated against him on the basis of disability and retaliated against him in violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* (Dkt. 3). Pending before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] (Dkt. 53). For the reasons set forth below, the Court grants Defendant's motion.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Denis R. McDonough, who became the Secretary of Veterans Affairs on February 9, 2021, is automatically substituted herein as the defendant in place of previously named defendant Robert L. Wilkie. The Clerk of Court is directed to terminate Robert L. Wilkie as Defendant.

[2]    Also pending is Defendant's motion to grant Plaintiff leave to file an amended statement of facts in opposition to Defendant's motion for summary judgment and to

## FACTUAL BACKGROUND

The following facts are taken from Defendant's Statement of Undisputed Material Facts (Dkt. 53-1), Plaintiff's Amended Response to Defendant's Statement of Undisputed Material Facts (Dkt. 59), and the exhibits submitted by the parties.  Unless otherwise noted, the facts set forth below are undisputed.

Plaintiff is a veteran of the United States Army who served in Iraq.  (Dkt. 53-1 at ¶¶ 2, 4; Dkt 59 at ¶¶ 2, 4).  In the course of his service, Plaintiff sustained skull fractures and injuries to his back resulting in ongoing symptoms including migraines, hearing loss, and memory issues.  (Dkt 53-1 at ¶ 4; Dkt. 59 at ¶ 4).  Plaintiff has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and a traumatic brain injury (a "TBI").  (Dkt. 53-1 at ¶ 5; Dkt. 59 at ¶ 5).  During his service in the United States Army, Plaintiff attended military police training school.  (Dkt. 53-1 at ¶ 3; Dkt. 59 at ¶ 3).  He was honorably discharged on July 29, 2006, and joined the United States Department of Veterans Affairs as a police officer on October 15, 2006.  (Dkt. 53-1 at ¶¶ 4, 6; Dkt. 59 at ¶¶ 4, 6).  He was initially assigned to the Veterans Affairs (the "VA") facility in Syracuse, New York.  (Dkt. 53-1 at ¶ 6; Dkt. 59 at ¶ 6).

---

extend Defendant's deadline to file his reply.  (Dkt. 58).  This motion is granted *nunc pro tunc* July 13, 2021.

On or about July 22, 2007, Plaintiff began working at CVAMC in Canandaigua, New York.[3]  During the period that Plaintiff was a police officer at CVAMC, Craig Howard ("Howard") served as the CVAMC director and Margaret "Peg" Owens ("Owens") served as the associate director.  (Dkt. 53-1 at ¶¶ 13, 14; Dkt. 59 at ¶¶ 13, 14). Plaintiff's first cousin, Joseph Day ("Day"), had been a police officer at CVAMC since 2000 and became a training officer in 2004.  (Dkt. 53-1 at ¶¶ 16, 19; Dkt. 59 at ¶¶ 16, 19).  At that time, Lawrence Scheuermann ("Scheuermann") was the Chief of the CVAMC Police Department.  (Dkt. 53-1 at ¶ 25; Dkt. 59 at ¶ 25).  Day played no role in hiring Plaintiff.  (Dkt. 53-1 at ¶ 28; Dkt. 59 at ¶ 28).  In the course of Plaintiff's application, he disclosed that Day is his first cousin.  (Dkt. 53-1 at ¶ 32; Dkt. 59 at ¶ 32).

In 2010, Plaintiff briefly served as a police officer at the VA Western New York Healthcare Facility in Batavia, New York.  (Dkt. 53-1 at ¶ 30; Dkt. 53-6 at 30; Dkt. 59 at ¶ 30).  However, Plaintiff returned to CVAMC later that year, having tired of the commute from his home in Farmington, New York to Batavia.  (Dkt. 53-1 at ¶ 31; Dkt. 53-6 at 30-32; Dkt. 59 at ¶ 31).

In 2011 or 2012, Scheuermann retired, and Day was selected as the acting police chief roughly contemporaneously.  (Dkt. 53-1 at ¶ 37; Dkt. 59 at ¶ 37).  In 2013, Howard approved Day as the permanent CVAMC police chief after a search for Scheuermann's replacement was completed.  (Dkt. 53-1 at ¶ 38; Dkt. 59 at ¶ 38).  In June 2012, a

---

[3]    Defendant contends that Plaintiff was voluntarily reassigned to CVAMC.  (Dkt. 53-1 at ¶ 7).  Plaintiff contests this, asserting that Plaintiff applied and interviewed for the position alongside external applicants.  (Dkt. 59 at ¶ 7).

member of the CVAMC police department expressed concern to Owens that Day supervised a relative.  (Dkt. 53-1 at ¶ 41; Dkt. 59 at ¶ 41).  As a result of this complaint, Owens and CVAMC Human Resources Manager Donna Crouse ("Crouse") sought an arrangement in which Day would not directly supervise Plaintiff.  (Dkt. 53-1 at ¶ 45; *but see* Dkt. 59 at ¶ 45).[4]

In August 2012, CVAMC Fire Chief Daniel Speers ("Speers") was assigned as first-level supervisor to Plaintiff and Chief Engineer Christopher Hall ("Hall") was assigned as second-level supervisor.  (Dkt. 53-1 at ¶ 46; Dkt 59 at ¶ 46).  Speers and Hall told Crouse that they were uncomfortable supervising Plaintiff because they were not police officers.  (Dkt. 53-1 at ¶ 48; Dkt. 59 at ¶ 48).

In April 2013, Veterans Integrated Service Network ("VISN") Police Chief John McDonnell directed an investigation of the CVAMC Police Department due in part to an alleged physical altercation between Plaintiff and Service Employees International Union ("SEIU") Local 200 Chapter Chair Donald Woodworth ("Woodworth") with whom Plaintiff had ongoing interpersonal difficulties.  (Dkt. 53-1 at ¶¶ 51, 77, 136, 137; Dkt. 59 at ¶¶ 51, 77, 136, 137).  As a result of this investigation, Bath VA Medical Center Police Chief Earl Burkhardt ("Burkhardt") was assigned to conduct the investigation.  (Dkt. 53-1 at ¶ 51; Dkt. 59 at ¶ 51).  Burkhardt concluded that Plaintiff's position—subordinate to Speers—constituted a "serious violation of VA Handbook [Directive] 0730[,]" which

---

[4]    Plaintiff disputes the characterization of the efforts to deal with the nepotism issue as an effort to accommodate him in his position as a police officer and instead contends that the focus was to investigate.  (*See* Dkt. 59 at ¶ 45).

requires that police officers be supervised by other police officers.  (Dkt. 53-1 at ¶¶ 52, 53; Dkt. 59 at ¶¶ 52, 53).  Burkhardt also raised concerns of favoritism between Day and Plaintiff.  (Dkt. 53-1 at ¶ 55; Dkt. 59 at ¶ 55).

Following the altercation, Day handed a written counseling memorandum to Plaintiff that was written by Owens or Day.  (Dkt. 53-1 at ¶ 56; Dkt. 59 at ¶ 56).  Howard testified that after the investigation, it became apparent that Crouse's efforts to manage the familial relationship between Day and Plaintiff were "decent work," but the arrangement "was not working out[,] and . . . something must be done."  (*Id.* at ¶ 58; Dkt. 53-6 at 81; Dkt. 59 at ¶ 58).  At the close of the investigation, Kent Strege ("Strege") was promoted to deputy police chief.  (Dkt. 53-1 at ¶ 40; Dkt. 59 at ¶ 40).  CVAMC Officials believed that having Strege as direct supervisor to Plaintiff would alleviate the nepotic supervision issue.  (Dkt. 53-1 at ¶ 60; *see* Dkt. 53-6 at 96; Dkt. 59 at ¶ 60).

On or about October 29, 2013, the United States Office of the Special Counsel ("OSC") received a complaint raising concerns of nepotism related to Day's direct supervision of Plaintiff.  (Dkt. 53-1 at ¶¶ 62, 63; Dkt. 59 at ¶¶ 62, 63).  Thereafter, OSC investigated whether the supervisory relationship between Plaintiff and Day conflicted with VA regulations or federal law.  (*See* Dkt. 53-1 at ¶¶ 64-78; Dkt. 59 at ¶¶ 64-78).  OSC produced a report of investigation (the "ROI"), which concluded that Day's supervisory relationship to Plaintiff potentially violated 5 U.S.C. § 2302(b)(7), which VA management officials understood to limit VA and federal employees from supervising

family members.  (Dkt. 53-1 at ¶¶ 65; Dkt. 59 at ¶¶ 65).[5]  The report detailed instances in which Plaintiff received performance awards with recommendations for such awards coming from Day and instances suggesting Day effectively supervised Plaintiff.  (Dkt. 53-1 at ¶¶ 68-69, 71; Dkt. 59 at ¶¶ 68-69, 71).  The ROI determined that despite the attempts to insulate Plaintiff from Day's supervision, concerns of nepotism persisted.  (*See* Dkt. 53-1 at ¶¶ 78-79; Dkt. 53-5 at 58-59; Dkt. 59 at ¶¶ 78-79).

During the investigation, Owens asked an OSC investigator why Strege's position as an intermediate supervisor between Day and Plaintiff did not sufficiently allay nepotism concerns.  (Dkt. 53-6 at 125).  The investigator informed her that the familial relationship was still in the chain of command from Day to Plaintiff.  (*See* Dkt. 53-1 at ¶ 78; Dkt. 53-6 at 125; Dkt. 59 at ¶ 78).  On November 12, 2014, Plaintiff was informed that Owens would become his supervisor until notified otherwise.  (Dkt. 53-5 at 70).  Howard believed that the OSC investigation required that Plaintiff not be supervised by Day, and VA Directive 0730 required that Plaintiff be supervised by another police officer.  (Dkt. 53-1 at ¶¶ 52-54; Dkt. 59 at ¶¶ 52-54). As such, Crouse and Owens explored alternative reporting structures including reassigning both Plaintiff and Day. (Dkt. 53-1 at ¶ 88; Dkt. 59 at ¶ 88).

---

[5]     Although Plaintiff disputes that the OSC ROI found that Strege's intermediate supervisory position between Day and Larnard insufficiently dealt with nepotism concerns, Plaintiff does not dispute that Owens testified that this was her understanding. (*See* Dkt. 59 at ¶ 65).

One such option involved creating a criminal investigator position—a VISN-wide position, which would not report to Day.  (Dkt. 53-1 at ¶¶ 95-96; Dkt. 59 at ¶¶ 95-96).  However, OSC expressed concern that the criminal investigator position would involve a promotion from GS-6 to GS-7.  (Dkt. 53-1 at ¶ 97; Dkt. 53-6 at 99-100; Dkt. 59 at ¶ 97).  Ultimately, the criminal investigator position was not filled.  (Dkt. 53-1 at ¶ 98; Dkt. 59 at ¶ 98).

On April 8, 2015, Crouse and Owens informed Plaintiff that he could not continue to work as a police officer at CVAMC with Day as the CVAMC Chief of Police.  (Dkt. 53-1 at ¶ 101; Dkt. 59 at ¶ 101).  Instead, Crouse and Owens proposed an expected opening with the Bath VA Medical Center Police Department, which would have increased Plaintiff's commute, or a Social Services Associate ("SSA") position within CVAMC at the same GS-6 grade.  (Dkt. 59 at ¶¶ 103, 111-12; Dkt. 59 at ¶¶ 103, 111-12).[6]  Plaintiff declined both positions, and Plaintiff was reassigned to the SSA position effective May 3, 2015.  (*Id.* at ¶ 115).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on April 25, 2017 (Dkt. 1), and filed an amended complaint on April 26, 2017.  (Dkt. 3).  This matter was referred to United States Magistrate Judge Jonathan W. Feldman (Dkt. 8) and subsequently to United States

---

[6]    Plaintiff notes that the expected vacancy in Bath was not yet open at the time of his conversation with Owens and Crouse.  (Dkt. 59 at ¶ 103).

Magistrate Judge Mark W. Pedersen (Dkt. 37) for all pretrial matters excluding dispositive motions.

Defendant filed the instant motion for summary judgment on May 21, 2021.  (Dkt. 53).  Plaintiff filed his response on July 2, 2021.  (Dkt. 57).  On July 13, 2021, Defendant sought an extension of time for Plaintiff to file his amended response to material facts not in dispute and for Defendant to file his reply.  (Dkt. 58).  Plaintiff filed his amended statement of material facts not in dispute on July 15, 2021.  (Dkt. 59).  Defendant filed his reply on July 23, 2021.  (Dkt. 60).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary

materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment" for defendants in discrimination cases where "the merits turn on a dispute as to the [defendant's] intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "Though caution must be exercised in granting summary judgment where motive is genuinely in issue, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

## II.   **Disability Discrimination**

### A.   **Legal Standard**

Plaintiff alleges that he was discriminated against based on disabilities related to PTSD and the TBI he suffered during his military service.[7]   (Dkt. 3 at ¶¶ 21, 23-25). Section 794(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency. . . ."  29 U.S.C. § 794(a).

Claims of intentional discrimination pressed under the Rehabilitation Act are analyzed pursuant to the burden-shifting framework described in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Voss v. McDonough,* 17-CV-09015 (PMH), 2021 WL 4199941, at *9 (S.D.N.Y. Sept. 15, 2021) (citation omitted).  The *McDonnell Douglas* burden shifting framework proceeds as follows:

---

[7]   Plaintiff asserts in the amended complaint that this suit is "authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ('ADA'), 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ('Title VII'), 42 U.S.C. § 1981, and pursuant to the Rehabilitation Act of 1973, as amended 29 U.S.C. § 706, 791 et seq." (Dkt. 3 at ¶ 1).  However, "[i]n the Second Circuit, Section 501 of the Rehabilitation Act provides the exclusive route by which federal employees may raise claims of employment discrimination on the basis of disability." *Hodges v. Att'y Gen. of U.S.*, 976 F. Supp. 2d 480, 490 (S.D.N.Y. 2013) (citations omitted).  Furthermore, both Plaintiff's and Defendant's summary judgment briefing address only the Rehabilitation Act with respect to Plaintiff's alleged disability.  Thus, the Court will evaluate Plaintiff's disability claims pursuant to the Rehabilitation Act.

> To survive summary judgment on a claim related to an adverse employment action, a plaintiff must first establish a *prima facie* claim of discrimination. Once a plaintiff establishes such a case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors and the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment.  If the employer offers such a legitimate reason, the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination.

*Id.*  To make out a *prima facie* claim of employment discrimination in violation of the Rehabilitation Act, a plaintiff must allege that: "(1) plaintiff's employer is subject to the Rehabilitation Act; (2) plaintiff was disabled within the meaning of the Rehabilitation Act; (3) plaintiff was otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [his] disability."  *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 540-41 (S.D.N.Y. 2014) (citation and original alterations omitted). Discrimination on the basis of disability may take the form of "disparate treatment, disparate impact, or failure to make a reasonable accommodation."  *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

"[W]hen a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA [Americans with Disabilities Act]."  *Natofsky v. City of N.Y.*, 921 F.3d 337, 345 (2d Cir. 2019).  In particular, Plaintiff must show that "discrimination was the but-for cause of any adverse employment action."  *Id.* at 348.

- 11 -

Defendant concedes that it "is subject to the Rehabilitation Act; Plaintiff is qualified to perform the essential functions of his position as a Grade 6 Police Officer, and Plaintiff's reassignment effective May 3, 2015, to the position of a Grade 6 SSA was an adverse employment action." (Dkt. 53-2 at 11). However, Defendant argues that Plaintiff is not disabled or perceived to be disabled within the meaning of the Rehabilitation Act. (*Id.* at 5-6, 12, 15-17). As a result, Defendant argues that Plaintiff has not presented sufficient evidence to set forth a *prima facie* case of discrimination pursuant to the Rehabilitation Act. Defendant further argues that even if Plaintiff had established that he is disabled or perceived to be disabled, any disability or the perception thereof was not the but-for cause of his reassignment. (*Id.* at 17-23). The Court agrees.

**B.     Disability Within the Meaning of the Rehabilitation Act**

"The Rehabilitation Act defines the term 'individual with a disability' by cross reference to the Americans with Disabilities Act." *Martinez v. N.Y. State Div. of Human Rights*, No. 1:13-CV-1252-GHW, 2015 WL 437399, at *5 (S.D.N.Y. Feb. 2, 2015) (citing 29 U.S.C. § 705(20)(B)). "The ADA defines a disability as '(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3)).'" *Alexiadis v. N.Y. Coll. of Health Pros.*, 891 F. Supp. 2d 418, 428 (E.D.N.Y. 2012) (quoting 42 U.S.C. § 12102(1)). Effective January 1, 2009, "Congress enacted the ADA Amendments Act of 2008 ('ADAAA') . . ., which expanded the class of individuals entitled to protection under the ADA." *Id.* In

particular, the ADAAA rejected the Supreme Court's analysis in *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), which had strictly defined disability under the ADA.  *See id.*  As one court in this Circuit has explained:

> The ADAAA expanded the interpretation of the ADA's three-category definition of "disability."  For example, "major life activity" includes "caring for oneself, performing manual tasks . . . walking, standing, lifting, bending, speaking, breathing . . . and working," as well as "the operation of a major bodily function," including "neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."

*Hutchinson v. Ecolab, Inc.*, No. 3:09-cv-1848(JBA), 2011 WL 4542957, at *8 (D. Conn. Sept. 28, 2011) (quoting Pub. L. No. 110–325, 122 Stat. 3553, 3555 (2008)).

"To determine whether or not a plaintiff suffers from a disability, the Supreme Court compels district courts to follow a three-step process[.]"  *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 145 (E.D.N.Y. 2018).  Specifically, the Court must assess "(1) whether plaintiff had an impairment; (2) whether the impairment affected a 'major life activity' within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment."  *Mazza v. Bratton*, 108 F. Supp. 2d 167, 173 (E.D.N.Y. 2000) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).  In assessing whether an impairment substantially limits a major life activity, the Court compares a plaintiff's ability to perform such activity to "most people in the general population."  *Martinez*, 2015 WL 437399, at *6 (citation omitted).  "To determine whether a major life activity is substantially limited by an impairment, this Court considers, among other

factors, 'the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact.'" *Jones v. N.Y.C. Trans. Auth.*, 838 F. App'x 642, 644 (2d Cir. 2021) (Summary Order) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 57 (2d Cir. 2005)).

Although Plaintiff's memory issues and fear of flying related to his TBI and PTSD constitute an impairment, the evidence in the record is insufficient to demonstrate that Plaintiff's impairments substantially limited a major life activity as defined by the ADA. Plaintiff has satisfied that his fear of flying and memory issues related to his PTSD and TBI constitute an impairment. *See Mazza*, 108 F. Supp. 2d at 173. There are two instances in which Plaintiff's conditions manifested impairments.[8] First, Plaintiff was required to travel to Little Rock, Arkansas for a work activity. (*See* Dkt. 53-1 at ¶ 130; Dkt 53-6 at 109-110). Either Day or Plaintiff brought to Owens's attention that Plaintiff had a fear of flying related to an experience in which he came under fire in combat while flying. (Dkt. 53-1 at ¶ 130; Dkt. 59 at ¶ 130). Upon being notified, Owens declined Plaintiff's request to travel by car because such an arrangement would have been more expensive than flying. (Dkt. 59 at ¶ 130, Dkt. 57-9 at 6). However, Plaintiff has failed to demonstrate that his fear of flying "affect[s] a major life activity," or that the major life activity is "substantially impaired[.]" *Mazza*, 108 F. Supp. 2d at 173. There is no evidence that Plaintiff's fear of flying or having been required to fly had any impact on

---

[8]    Plaintiff asserts that there were "three instances that touched on Plaintiff's disabilities[.]" (Dkt. 59 at ¶ 130). However, Plaintiff only discusses his fear of flying related to his combat experiences. (*See id.*).

his ability to perform a major life activity or bore on Plaintiff's duties as a police officer in any capacity.  There is no indication in the record that Plaintiff's PTSD limited any major life activity in any other way, nor does the record show that such a limitation was substantial.  Thus, Plaintiff has failed to establish that his PTSD constitutes a disability within the meaning of the ADA.  *See Pineda v. ESPN, Inc*., No. 3:18-CV-325 (MPS), 2018 WL 5268123, at *3 (D. Conn. Oct. 23, 2018) (dismissing claim of disability discrimination based on PTSD where the plaintiff alleged generally that her PTSD symptoms interfered with her ability to work but failed to specify "how those symptoms impacted her ability to perform her job as an Associate Producer").

The second instance in which Plaintiff's conditions constituted an impairment is Plaintiff's short-term memory limitations.[9]  (Dkt. 53-1 at ¶ 132).  Plaintiff used a cell phone to record conversations with his coworkers in order to assist himself in recalling the conversations.  (*Id.*).  This practice originally came to light after coworkers submitted complaints that Plaintiff was recording their conversations using his VA-issued cell phone.  (Dkt. 53-1 at ¶ 176; Dkt. 53-2 at 9).  However, upon further investigation, VA officials discovered that Plaintiff's doctor had prescribed the phone to him in order to assist his recall.  (Dkt. 53-1 at ¶ 177).

Although memory issues fall squarely within the "neurological" or "learning" categories contemplated by the ADAAA, *see* Pub. L. No. 110–325, 122 Stat. 3553

---

[9]    Plaintiff does not specify whether his short-term memory impairment is related to his PTSD or TBI diagnosis or both.

(2008), Plaintiff has failed to put forth any evidence that his impairment limits a major life activity or that such a limitation is substantial.  Plaintiff states merely that he "had memory issues that he compensated for by using his cell phone" (Dkt. 57-13 at 9) and cites to deposition testimony, which only clarifies that the memory issues relate to his short-term memory (Dkt. 57-8 at 11).  The Second Circuit has held that major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, [or] working[.]"  *Jones*, 838 F. App'x at 644 (citing 45 C.F.R. § 84.3(j)(2)(ii)).  Plaintiff does not assert that his short-term memory issues substantially impair any of these activities.

Indeed, there is only one instance in the record of Plaintiff's short-term memory impairment affecting any life activity.  In deposition testimony, Plaintiff describes an instance in which he left his key in the door and forgot that he had done so.  (Dkt. 53-6 at 66).  Moreover, Plaintiff testified that although his short-term memory is impaired, his long-term memory is very strong.  (*Id.* at 65-66).  "[D]ifficulties with short-term memory . . . are not uncommon among the general population, and plaintiff's description of [his] difficulties does not suggest that [his] limitations . . . are significant rather than mild." *Stephan v. West Irondequoit Cent. Sch. Dist.*, 769 F. Supp. 2d 104, 108 (W.D.N.Y. 2011), *aff'd*, 450 F. App'x 77 (2d Cir. 2011) (granting motion for summary judgment where Plaintiff failed to establish that she was disabled within the meaning of the ADA). Accordingly, Plaintiff has failed to show that he is disabled within the meaning of the Rehabilitation Act.

Plaintiff also argues that he "has shown that there was a perception that he was disabled." (Dkt. 57-13 at 9).

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C.A. § 12102(3)(a). Crucially, Plaintiff must show "that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Stolpner v. N.Y. Univ. Lutheran Med. Ctr.*, No. 16-CV-997(KAM), 2018 WL 4697279, at *22 (E.D.N.Y. Sept. 29, 2018) (citing *Francis v. City of Meriden*, 129 F.3d 281, 285 (2d Cir. 1997)).

Plaintiff has failed to show that there is a genuine issue of material fact as to whether CVAMC management regarded him as disabled. Although Plaintiff asserts that there is a genuine issue of material fact as to whether Owens considered Plaintiff to be disabled (*see* Dkt. 59 at ¶ 127), deposition testimony from Owens, Howard, and Day, indicate that each of them considered Plaintiff to be a "good" or "outstanding" officer and CVAMC management officials did not consider his impairments to render him disabled. (Dkt. 53-1 at ¶¶ 125-127; Dkt. 53-6 at 88, 109-110, 203). The only evidence that Plaintiff offers to support the claim that CVAMC officials regarded him as disabled are that Owens or Crouse caused another employee to access Plaintiff's medical records and that Owens asked Plaintiff about injuries he sustained in his military service. (Dkt. 57-13

at 9-10). Even if, as Plaintiff argues, CVAMC officials knew about Plaintiff's conditions, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Stolpner*, 2018 WL 4697279, at *27 (citation omitted) (granting summary judgment on ADA claim where plaintiff failed to show he was regarded as disabled). Plaintiff has not offered evidence sufficient to establish a genuine issue of material fact that Plaintiff was regarded as having a disability.

Plaintiff asserts that "[t]he OSC report provided categorically that [Plaintiff] was to receive the criminal investigator position" that would have moved Plaintiff into a position that Day would not supervise. (Dkt. 57-13 at 10). However, Plaintiff does not include the OSC report as an exhibit or cite to any section in the redacted OSC report that was attached as an exhibit to Defendant's motion for summary judgment. (*See id.*). Furthermore, Defendant concedes that Plaintiff's reassignment was an adverse employment action. (Dkt. 53-2 at 11). Even assuming that Plaintiff had established a legal entitlement to the criminal investigator position, failure to then be hired into the position would only bear on the adverse employment action aspect of his *prima facie* case, which would not remedy the remaining deficiencies in the *prima facie* case. Accordingly, summary judgment is appropriate.

C.      **Discrimination Because of Disability**

Even if Plaintiff could establish that he was disabled within the meaning of the Rehabilitation Act, summary judgment would still be mandated in favor of Defendant because there are no genuine issues of material fact concerning the causation element of Plaintiff's claim.  At the *prima facie* stage, to show that disability was the cause of the adverse employment action, "Plaintiff has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that [his] discharge occurred under circumstances giving rise to an inference of discrimination." *Kleyman v. SUNY Downstate Med. Ctr.*, No. 18-CV-3137 (PKC) (ST), 2020 WL 5645218, at *15 (E.D.N.Y. Sept. 21, 2020) (quoting *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *4 (S.D.N.Y. Jan. 23, 2019)).  "Evidence leading to the inference of discrimination may include discriminatory comments made by the defendant relating to a disability, failure to take actions required for a disabled employee to return to work, or preferential treatment of employees similarly situated to the plaintiff who are not members of the plaintiff's protected class." *Schneider*, 2019 WL 294309, at *4.

The Court will assume, without deciding, that Plaintiff could establish causation at the *prima facie* stage.  However, the record does not support a finding of causation at the third step of the *McDonnell Douglas* test.  In other words, Defendant has proffered a legitimate, nondiscriminatory reason for the adverse action, and Plaintiff has not established a genuine issue of material fact as to whether any disabilities or the

- 19 -

perception thereof were pretextual or that disability or the perception thereof were the but-for cause of Plaintiff's reassignment. *See Natofsky*, 921 F.3d at 345; *Voss*, 2021 WL 4199941, at \*9.

Defendant contends that CVAMC ultimately reassigned Plaintiff because the nepotic arrangement within CVAMC under which Plaintiff reported to his first cousin, Day, became untenable. (*See* Dkt. 53-2 at 11). Beginning in 2012, concerns were raised to CVAMC management that the reporting relationship violated federal anti-nepotism statutes, regulations, and VA directives. (Dkt. 53-1 at ¶¶ 41-44, 52). CVAMC management implemented multiple reporting arrangements over the course of three years in order to insulate Plaintiff from reporting directly to Day and to comply with relevant statutes and regulations. (*Id.* at ¶¶ 46, 61).

However, concerns were raised that Day's relationship to Plaintiff was still within the chain of command in the CVAMC Police Department despite Strege's intermediate supervisory position. (*See id.* at ¶ 78; Dkt. 53-6 at 125; Dkt. 59 at ¶ 78). CVAMC management proposed two solutions to Plaintiff: an expected opening with the Bath VA Medical Center Police Department, which would have increased Plaintiff's commute, or a SSA position within CVAMC at the same GS-6 grade. (Dkt. 53-1 at ¶¶ 103, 106, 111-112). Plaintiff declined to accept either position, and CVAMC management reassigned him to the SSA position. (*Id.* at ¶ 115).[10] In other words, Defendant has come forward

---

[10]     Plaintiff argues for the first time in his opposition papers to the summary judgment motion that the choice offered to Plaintiff between a position outside of his field and a

with evidence of continual attempts to comply with statutes, regulations, and VA directives governing nepotism—a legitimate, non-discriminatory reason for Plaintiff's reassignment. *See Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 524 (S.D.N.Y. 2018) ("Compliance with mandatory federal regulations . . . is considered a legitimate non-discriminatory reason." (citations omitted)).

Having offered a legitimate, nondiscriminatory reason for the adverse action, "the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 717 (S.D.N.Y. 2018). "[O]nce a defendant has established the existence of a non-retaliatory reason for the adverse employment action, a plaintiff must 'establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action.'" *Kleyman*, 2020 WL 5645218, at *15 (citing *Bailey v. Mount Vernon City Sch. Dist.,* No. 17-CV-9973 (KMK), 2020 WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020)) (alteration in original). "Pretext may be demonstrated by additional evidence that the employer's proffered reason is not credible or by reliance on the evidence supporting the *prima facie* case alone." *Schneider v. Wal-Mart Stores, Inc.*, No.

---

position that "did not actually exist" constitutes constructive discharge. (Dkt. 57-13 at 6-7). "It is clearly improper for a litigant to assert new claims for the first time at the summary judgment stage." *Byrd v. KTB Capital LLC*, No. 6:16-CV-06017 (MAT), 2019 WL 652529, at *4 (W.D.N.Y. Feb. 15, 2019); *see also Rao v. Rodriguez,* No. 14 Civ. 1936 (NGG) (ST), 2017 WL 1214437, at *5 n.8 (E.D.N.Y. Mar. 31, 2017) (declining to consider constructive discharge claim in discrimination action raised for the first time at summary judgment). Plaintiff also argues that CVAMC has violated his Veterans Recruitment Appointment rights for the first time in his opposition papers. (Dkt. 57-13 at 12-13). For the same reasons as above, the Court will not consider this claim.

16-cv-2010 (NSR), 2019 WL 294309, at *5 (S.D.N.Y Jan. 23, 2019) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

Plaintiff argues that compliance with nepotism statutes and regulations is a pretext for discrimination and that his disability or the perception thereof was the but-for cause of the challenged action. [11]   (Dkt. 57-13 at 14-15).   Plaintiff cites CVAMC management's awareness of Plaintiff's conditions and alleged improper access of his medical records as evidence of "animus toward [P]laintiff related to his disabilities."   (Dkt. 57-13 at 14). Defendant argues that Plaintiff has failed to put forth evidence that Owens directed any employee to access Plaintiff's medical records and that any access that occurred was unauthorized. (Dkt. 60 at 8-9).  Even if Plaintiff had shown that Owens or Crouse caused an employee to access Plaintiff's records improperly in 2012, such access does not indicate that CVAMC management had a discriminatory motive in reassigning Plaintiff in 2015.  *See Stolpner*, 2018 WL 4697279, at *27 ("[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the

---

[11]    Plaintiff asserts that he is a "ten-point preference eligible veteran" which entitled him "to a waiver of the nepotism clause if it meant he would be passed over for a position." (Dkt. 57-13 at 4, 6).  The block quote on page 13 of Plaintiff's memorandum of law purportedly supporting this position is cited as "5 U.S.C. 3312, 3318[,]" and it appears to originate from *Vet Guide for HR Professionals*, Office of Personnel Management, https://www.opm.gov/policy-data-oversight/veterans-services/vet-guide-for-hr-professionals/.  However, the first paragraph of the block quote is a paraphrase of 5 C.F.R. § 310.103(a) (2005).  The second paragraph of the block quote is a paraphrase of 5 C.F.R. § 310.103(d) (2005).  This section of the Code of Federal Regulations was removed as of 2006.  *See* 5 C.F.R. part 310 (2006).  As such, it was not in effect for several years before the events giving rise to this action occurred, and no analogous provision has replaced it.  The provision is not currently in effect.  *See* 5 C.F.R. part 310 (2021).

employer regarded the employee as disabled or that that perception caused the adverse employment action." (citation omitted)).  Because Owens's or Crouse's mere awareness of Plaintiff's conditions is insufficient to show that either had a discriminatory motive in reassigning Plaintiff, their awareness, however obtained, does not establish that Defendant's legitimate, non-discriminatory reason for reassigning Plaintiff is false or inadequate to support the adverse employment action.  *See Kleyman*, 2020 WL 5645218, at *15.

Plaintiff cites to Owens's shifting explanation for not placing Plaintiff into the criminal investigator position, and her asking him about his medical conditions as evidence that she is not credible and harbored a discriminatory animus.  (*See* Dkt. 57-13 at 11-13).  The record does not support the contention that Owens's explanations were shifting—as set forth in Defendant's reply memorandum, any action taken by CVAMC was subject to final approval by the OSC, and Owens stated in her sworn EEO Affidavit that the OSC determined that Plaintiff's promotion would violate the anti-nepotism statute.  (Dkt. 60 at 6-7).  The fact that Owens had difficulty some four years later recalling what happened with the criminal investigator position (*id.* at 7) does not translate to a shifting position, and doubt introduced by her inability to recall is insufficient to survive summary judgment.  *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (A nonmovant seeking to avoid summary judgment "must demonstrate more than some metaphysical doubt as to the material facts[.]" (citation and internal quotation marks omitted)).  Indeed, neither Howard nor Crouse could remember

what happened with the criminal investigator position in their depositions in 2019 and 2021, respectively.  (Dkt. 53-6 at 84; Dkt. 57-3 at 9-10; Dkt. 57-6 at 4-5).  Defendant has set forth evidence indicating that the criminal investigator position was no longer an option as it would lead to a promotion for Plaintiff arising out of his nepotic relationship to his superior.  (Dkt. 60 at 6-7).

Plaintiff has put forth no facts to support his position that the outcome surrounding the criminal investigator position is the result of discrimination based on disability rather than to avoid the appearance of preferential treatment.  *See Powell*, 364 F.3d at 84 ("If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must . . . come forward with specific facts showing that there is a genuine issue for trial." (citation and internal quotation marks omitted)).  Plaintiff's argument does not sufficiently indicate that Defendant's efforts to comply with federal anti-nepotism statutes and regulations is pretextual, and it certainly does not rise to the level of establishing a sufficient factual basis for a reasonable jury to conclude that Plaintiff could meet the but-for causation standard.

Even if, as Plaintiff suggests in his response papers, CVAMC might have promoted Strege rather than Day and Day might have gone to the Bath VA as chief, thereby obviating potential nepotism concerns, it is not the Court's role to second-guess CVAMC's judgment in hiring Day as police chief.  Plaintiff contends that Day was not the best candidate to be police chief because Strege "had eight months as acting chief, while Day had zero."  (Dkt. 57-13 at 4).  However, Owens testified that despite concerns

of nepotism, she could not deny Day the promotion she felt he deserved.  (Dkt. 53-1 at 29).  It is not the Court's position to assess Day's or Strege's qualifications for the police chief position.  "An employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position."  *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001).  "[T]his Court cannot sit as a super-personnel department to reevaluate that decision."  *McIntyre v. Corning Inc.*, 15-CV-6277 CJS-MWP, 2019 WL 2140625, at *12 (W.D.N.Y. May 16, 2019) (citing *Byrnie*, 243 F.3d at 106).

Although Day's promotion might have precipitated the nepotic arrangement that ultimately resulted in Plaintiff's reassignment, there is no evidence that Day's promotion resulted from discriminatory animus toward Plaintiff rather than lack of foresight. Therefore, Plaintiff has failed to set forth a genuine issue of material fact that discriminatory animus, manifested through Day's promotion, was the but-for cause of his reassignment—especially where Day was hired as police chief in August 2013, and Plaintiff was reassigned nearly two years later after multiple attempts to retain him.  (*See* Dkt. 53-1 at ¶¶ 20, 46, 61, 197).

Plaintiff further claims that CVAMC management failed to act on Plaintiff's complaints that Woodworth and fellow officer Brian Wert ("Wert") mocked Plaintiff with names related to his conditions such as "TBI Teddy" and "PTSD Teddy" and instead investigated Plaintiff, indicating a discriminatory animus.  (Dkt. 57-13 at 13-14; Dkt. 59 at ¶¶ 147, 152).  Despite Plaintiff's testimony that he registered multiple complaints with CVAMC officials regarding Woodworth's and Wert's behavior (*see* Dkt. 57-8 at 24-28),

neither Crouse, Howard, nor Owens recalled having received a complaint from Plaintiff about Woodworth's or Wert's behavior (*see* Dkt. 57-9 at 18 (2015 Owens EEO Dep.); Dkt. 53-6 at 115-16, 125 (2019 Owens Dep.); Dkt. 53-6 at 89 (2019 Howard Dep.); Dkt. 57-10 at 13-15 (2015 Crouse EEO Dep.); Dkt. 53-6 at 149-152 (2021 Crouse Dep.)). Day recalled Plaintiff informing him that Plaintiff and Woodworth did not get along, but Day did not see these discussions as Plaintiff registering a complaint of disability discrimination.  (Dkt. 53-6 at 193, 195).  Owens was also aware that Woodworth and Wert "did not get along very well."  (Dkt. 53-6 at 115).

Arguably the only complaint to CVAMC management in the record concretely relating to Plaintiff's alleged disabilities came to Strege from Shannon Dale ("Dale"), a CVAMC police officer.  (*See* Dkt. 57-7 at 9-10).  In 2013, Dale informed Strege that she overheard Woodworth mocking Plaintiff.  (*Id.* at 10).  Strege spoke to Plaintiff about the issue and elevated the complaint to Owens.  (*Id.*).  Owens testified that she believed she tasked Day with speaking to Woodworth about the issue.  (Dkt. 57-4 at 9).  Irrespective of the complaint's specific outcome, nothing in the record indicates that discriminatory animus motivated a difference in investigations between Woodworth and Plaintiff. Indeed, in 2013, Owens and Day sought Woodworth's removal, although their efforts were unsuccessful.  (Dkt. 53-1 at ¶¶ 153, 160).

Even if Woodworth or Wert possessed discriminatory animus, Plaintiff has not established a genuine issue of material fact as to whether such animus can be imputed to CVAMC management.   "Verbal comments constitute evidence of discriminatory

- 26 -

motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007) (collecting cases). However, "[s]tray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (citation and quotation marks omitted). Neither Woodworth nor Wert was a decisionmaker, and Day and Owens testified that they had strained relationships with Woodworth and sought his removal. (Dkt. 53-1 at ¶¶ 153, 155, 160, 166; Dkt. 53-2 at 10; Dkt. 53-6 at 193). Based on the record before the Court, no reasonable jury could find that any discriminatory animus by Woodworth or Wert should be imputed to CVAMC management, or that such discriminatory animus was the but-for cause of Plaintiff's reassignment.

Plaintiff attempts to frame a contrast between CVAMC management's lack of investigation into Woodworth and their readiness to investigate Plaintiff, but the record does not support Plaintiff's framing. Although CVAMC investigated Plaintiff's use of a cell phone to record conversations, upon learning that Plaintiff was using a doctor-prescribed cell phone to address his short-term memory issues, the investigation was discontinued, and Plaintiff was permitted to continue the practice. (Dkt. 53-1 at ¶¶ 176, 177; Dkt. 53-2 at 9). Discrimination based on disability cannot be inferred from these facts.

Plaintiff also attempts to rely on Woodworth's alleged animosity toward Plaintiff under a cat's paw theory of liability. (Dkt. 57-13 at 13-14). In determining that but-for causation is the proper standard of causation for claims brought under the ADA and Rehabilitation Act, the Second Circuit declined to rule on whether a "cat's paw" theory of liability was a sufficient basis for determining liability pursuant to the ADA. *Natofsky*, 921 F.3d at 351. "Under a Cat's Paw theory of liability, a discriminatory motive may be imputed to a final decision-maker if the decision-maker's adverse employment action was proximately caused by a subordinate who had a discriminatory motive 'and intended to bring about the adverse employment action.'" *Id.* at 350 (quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)). The employer must "act negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation." *Vasquez*, 835 F.3d at 274 (citation omitted).

The Court sees no reason to decide the issue of whether to apply a cat's paw theory of liability in this case because Plaintiff's theory is ultimately unavailing. There is no evidence in the record that any CVAMC manager gave weight to Woodworth's opinion regarding Plaintiff. As discussed above, Owens testified both that she did not have a high opinion of Woodworth, and she and Day attempted to have him removed. (Dkt. 53-1 at ¶¶ 153, 155, 160, 166; Dkt. 53-2 at 10; Dkt. 53-6 at 193).

Plaintiff notes in his statement of material facts that there were instances of other family members working together at CVAMC. (Dkt. 59 at ¶¶ 184-85). "A plaintiff may

satisfy his or her burden at the pretext stage by showing that similarly situated employees outside the protected class received more favorable treatment than the plaintiff did." *Leblanc v. United Parcel Serv.*, No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014). In order to use other employees as comparators at the pretext stage, Plaintiff must show that the comparator employee is "(1) subject to the same standards and (2) engaged in comparable conduct, or, in other words are similarly[ ]situated in all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). As Defendant correctly notes, Plaintiff has not identified any CVAMC employees who were police officers subject to the same directives governing their reporting structures—particularly VA Directive 0730, which Bath VA Police Chief Burkhardt had determined limited CVAMC's ability to have Plaintiff report to non-police officer employees. (*See* Dkt. 53-1 at ¶ 52; Dkt. 60 at 7).

Drawing all inferences in Plaintiff's favor, no reasonable factfinder could find that CVAMC's attempts to comply with federal statutes and internal directives was a pretext for discrimination based on disability. Given the years-long attempts to maintain Plaintiff's employment at CVAMC, the apparently nepotic relationship between Day and Plaintiff, and the internal and OSC investigations into the relationship, even assuming that Plaintiff had established that he has a disability within the meaning of the Rehabilitation Act, he has failed to establish any genuine issue of material fact that any disability, rather than the familial relationship to his supervisor, was the but-for cause of his reassignment.

For all these reasons, summary judgment is warranted as to Plaintiff's cause of action for discrimination based on disability.

## III.   Retaliation

Plaintiff also asserts that he was "retaliated against for having engaged in the protected activity of opposing discrimination in employment" (Dkt. 3 at 2). The elements of a retaliation claim under the Rehabilitation Act are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (citation and alterations omitted). A plaintiff may show a causal connection either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (internal quotation marks omitted). In Title VII retaliation cases, the Second Circuit has "require[d] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 304 (2d Cir. 2021). However, the Second Circuit has not explicitly held that the same standard applies in retaliation cases under the Rehabilitation Act outside of non-precedential summary orders. *See Knope v. Garland*, 20-3274-cv, 2021 WL 5183536, at *4 (2d Cir. Nov. 9, 2021). The Court need not address this issue

- 30 -

because the Court lacks jurisdiction over this claim as Plaintiff has failed to exhaust the administrative remedies required before bringing the claim in this Court.

Defendant asserts that Plaintiff failed to raise a retaliation claim in his informal complaint with the VA Office of Resolution Management ("ORM") filed on April 23, 2015 or formal complaint in July 2015.  (Dkt. 53-2 at 26; Dkt. 53-1 at ¶¶ 191-194).  "In this Circuit, the Rehabilitation Act requires the exhaustion of administrative remedies . . . in cases brought by federal employees[.]"  *Wein v. N.Y.C. Dep't of Educ.*, 18 Civ. 11141 (PAE), 2020 WL 4903997, at *8 n.8 (S.D.N.Y. Aug. 19, 2020); *see also Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 169 n.11 (2d Cir. 2013) ("Courts have construed [§794a] of the Rehabilitation Act . . . as imposing [an exhaustion requirement] as to claims against a federal employer.").  Plaintiff does not contest Defendant's argument that the Rehabilitation Act requires administrative exhaustion in his response papers, and he admits the underlying facts that Plaintiff did not assert a retaliation claim in his complaint with the VA ORM.  (*See* Dkt. 57-13 at 15-16; 53-5 at 115; Dkt. 59 at ¶¶ 191-194).  The Court therefore does not have jurisdiction over Plaintiff's retaliation claim, and summary judgment is appropriate.  *See Walsh v. DeJoy*, 14-CV-7239 (GBD) (KNF), 2021 WL 4896979, at *11 (S.D.N.Y. July 28, 2021) (finding summary judgment appropriate on Title VII and Rehabilitation Act claims for which plaintiff failed to exhaust administrative remedies).[12]

---

[12]  The complaint makes a passing reference to a hostile work environment (Dkt. 3 at 2), but Plaintiff has not contended in his opposition papers that he is asserting such a

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 53) is

granted.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: January 4, 2022
        Rochester, New York

---

claim, and indeed, the complaint does not sufficiently assert any such claim. *Cf. Serdans v. Presbyterian Hosp in City of N.Y.*, No. 09–cv–1304 (PGG), 2011 WL 4443956, at *12 n.11 (S.D.N.Y. Sept. 26, 2011) ("Although the Complaint's *ad damnum* clause makes a passing reference to retaliation under the ADA-but not under the State and City Law— this reference is not sufficient to plead a claim for retaliation under the ADA."). Accordingly, the Court does not address any such claim in this Decision and Order.